2005 SD 83

**In the Matter of the DISCIPLINE OF Michael P. ORTNER, as an Attorney at Law.**

No. 23548.

Supreme Court of South Dakota.

Argued May 24, 2005.

Decided June 29, 2005.

Gene N. Lebrun of Lynn, Jackson, Shultz & Lebrun, Rapid City, SD, for Michael P. Ortner.

Robert B. Frieberg, Beresford, SD, for Disciplinary Board.

GILBERTSON, Chief Justice.

[¶ 1.] Following the release of this Court's decision in *Reaser v. Reaser*, 2004 SD 116, 688 N.W.2d 429, the Disciplinary Board of the State Bar of South Dakota

generated a complaint against Michael P. Ortner. Following its investigation and hearing in the matter, the Disciplinary Board filed findings of fact, conclusions of law, and a formal accusation against Ortner. This Board recommended that Ortner be publicly censured for his violation of the Rules of Professional Conduct. Ortner admitted the allegations in the formal accusation that followed. When an accused attorney admits the allegations, this Court "shall proceed to render such judgment as the case requires." SDCL 16–19–68.

## GENERAL BACKGROUND

[¶ 2.] Ortner is sixty-three years old. He graduated from the University of South Dakota with a degree in political science in 1965. Following graduate work and a fellowship, he worked for the governor of Iowa, was an assistant city manager in Sioux City, Iowa, and was a researcher for the Midwestern Office of the Council of State Government. He began working for South Dakota's Legislative Research Council in 1970, eventually becoming its director.

[¶ 3.] In 1976 Ortner entered the University of South Dakota's School of Law. He was one of fourteen graduating in December 1978 and said that he was at the top of these fourteen.

[¶ 4.] Since being admitted to the State Bar of South Dakota Ortner has practiced in Hot Springs, South Dakota. His focus consists mainly of real estate work, estate planning and probate. In the course of his practice he has represented "numerous clients in divorce and family law areas," although he attempts to avoid divorces involving minor children and never handles contested custody cases.

[¶ 5.] Ortner has been the subject of three prior complaints before the Disciplinary Board. Two were dismissed as frivolous. For the third, in 2001, he received an admonition for a technical, unintentional violation of the Rules of Professional Conduct which govern conflicts of interest.

[¶ 6.] Throughout his career Ortner has been active in non-profit service organizations, community boards, bar committees and state and county commissions. His outside interests include fishing and scuba diving.

## FACTS

[¶ 7.] Throughout their marriage David and Jami Reaser lived on David's family ranch where he worked. For twenty years Ortner helped the family with branding. When David initiated divorce proceedings in 1999 he retained Ortner to represent him. Jami did not have a lawyer. Ortner was aware that Jami's mother and stepfather were South Dakota lawyers and he assumed that they were assisting her.

[¶ 8.] Ortner prepared a stipulation regarding child custody, child support, alimony and property division which David and Jami signed. Pursuant to this stipulation David received custody of the children and relieved Jami of any child support obligation. Jami waived alimony. Ortner was aware of Circuit Judge Kern's policy to require child support in divorce decrees because when he presented the stipulation and decree of divorce to Judge Kern, he specifically "advised her there was something unusual about this particular stipulation for this divorce and that was that there was no provision in it for child support." Judge Kern refused to grant the divorce due to the omission of any provision for child support.

[¶ 9.] Ortner advised David that whoever did not have primary custody of the children would have to pay child support. Since David was receiving custody, Ortner

advised him that he could simply tear up any checks he received for child support. David discussed the proposal with Jami who, according to Ortner, definitely wanted something in writing.

[¶ 10.] Ortner revised the stipulation to include a provision for child support:

> [Jami] is required to pay child support for the minor children in the total amount of $250.00 per month, except during those summer months when she has the children for visitation. During those summer months, [David] shall pay $250.00 per month for support of the minor children. Said support shall continue until the younger child graduates from high school or turns 19 years of age, whichever is earlier.

The judgment decreeing dissolution of marriage that Ortner drafted incorporated the stipulation, "it being the intention of this court that all of the terms and conditions of said Stipulation be made an express part of this Decree of Dissolution."

[¶ 11.] At the time Ortner drafted these documents he also drafted a "Private Contractual Agreement Between Parties" which provided:

> It is hereby stipulated and agreed by and between David R. Reaser, the Plaintiff, and Jami D. Reaser, the Defendant, subject to the approval of the above-named Court, that in the event the Court does see fit to grant [David] hereto a dissolution as prayed for in his Complaint, the same shall be upon the terms and conditions as set forth in the Stipulation and Agreement, except that the parties further privately stipulate and agree between themselves as follows:
>
> I.
>
> That [David] agrees that he will not seek to collect the Two Hundred Fifty Dollars ($250.00) per month child support ordered to be paid by [Jami].
>
> II.
>
> [Jami] stipulates and agrees that during those times when she has custody of the minor children for visitation purposes in the summer for one month or longer that she will not seek to collect child support from [David].
>
> III.
>
> Both parties stipulate and agree and contract as set forth above even though the Court itself has ordered payment of child support. The basis of the agreement for the dissolution of the marriage was that no child support be paid and this agreement carries out that earlier agreement reached by the parties.

[¶ 12.] On March 29, 1999 Jami came to Ortner's office and signed the revised stipulation and the private contractual agreement. David signed the documents the next day. Judge Kern signed the judgment decreeing dissolution of marriage which incorporated the revised stipulation on April 1. It was filed on April 6, 1999. At no time did Ortner advise Judge Kern of the private contractual agreement.

[¶ 13.] In May 2002 Jami moved for a change in custody and sought child support. Circuit Judge Thomas Trimble heard the motions and learned of the existence of the private contractual agreement. He denied the motion for a change of custody and advised David that he was free to seek child support from Jami.

[¶ 14.] In the fall of 2002 David initiated a child support action against Jami. The child support referee's recommendations that Jami pay current child support and arrearages were adopted by the circuit court. Jami's motions to set aside the

interim order of support and eliminate the arrearages were heard by Judge John J. Delaney. Judge Delaney learned about the private contractual agreement and expressed serious concerns about the deception created by it. During this proceeding Ortner filed an "Affidavit Regarding Motion to Deny Claim for Arrears" which was dated April 1, 2003.

[¶ 15.] Ortner's affidavit states:

Comes now Michael Ortner, and for his Affidavit states and affirms as follows:

1. That Affiant is an attorney in practice in Hot Springs;

2. That Affiant has been active in a private general practice of law in Hot Springs for over twenty years;

3. That in the course of his practice Affiant has represented numerous clients in divorce and family law matters;

4. That in the early part of 1999 he spoke with David Reaser about preparing pleadings for divorce;

5. That the Stipulation and Divorce Decree were prepared by Affiant following his conversations with Mr. Reaser;

6. That Mr. Reaser instructed Affiant that the documents were to be prepared to reflect that no ongoing child support would be required to be paid by his ex-wife, now known as Jami Twiss;

7. That Affiant initially submitted the Stipulation and Decree of Divorce for review by the Court with no requirement for payment of ongoing child support;

8. That after a conference with the Court the Stipulation and Decree of Divorce were modified to include a child support provision;

9. That prior to submitting the second Decree to the Court Affiant drafted a document of private agreement between Mr. Reaser and Ms. Twiss;

10. That under the terms of that private agreement, Ms. Twiss was to have no duty to pay ongoing support despite the language of the Divorce Decree;

11. That it was Affiant's understanding that one of the reasons the parties had entered into such an agreement for no payment of support was that Ms. Twiss had agreed not to contest custody of the two minor children, and Ms. Twiss had also agreed not to seek any alimony or other property settlement despite the fact that the couple had been married for over thirteen years;

12. That after preparing the agreement of nonsupport, the parties signed it in Affiant's office, [Ms. Twiss] on March 29, 1999 and [Mr. Reaser] on March 30, 1999;

13. Affiant informed [Ms. Twiss] that even though the private agreement should be binding on the parties themselves it would not be binding upon the Court;

14. The parties also requested that Affiant retain the original of the signed Private Contractual Agreement in his office where it still remains;

15. That after the parties entered into this written agreement the Decree of Divorce was subsequently signed by the Circuit Court Judge.

Further Affiant sayeth not.

[¶ 16.] Judge Delaney filed findings of fact, conclusions of law and an order vacating judgment in regard to child custody, visitation, alimony and property settlement on November 18, 2003. Judge Delaney did so essentially sua sponte, because of

the private contractual agreement and the court's findings of fraud upon the court.[1]

[¶ 17.] David appealed. In *Reaser v. Reaser* he contended "that the court erred because the motion to set aside this decree was not made within one year as required by SDCL 15–6–60(b)." *Id.*, 2004 SD 116 at ¶ 15, 688 N.W.2d at 434.

[¶ 18.] In *Reaser* this Court noted that because David did not challenge Judge

1. The court found, in relevant part:

    11. That at the institution of these proceedings [David] was represented by Mr. Michael Ortner.

    12. That at the institution of the divorce proceedings [Jami] was unrepresented.

    13. That prior to the completion of the divorce action [David] transferred his interest in the family ranching operation back to his father and mother.

    14. That a stipulated divorce, placing custody of the children with [David], waiving alimony claims by [Jami], and waiving any child support to be paid by [Jami] to [David], was presented to the [c]ourt.

    15. The [c]ourt refused to issue a [d]ivorce [d]ecree based on the initial stipulated agreement because child support was not meaningfully addressed.

    16. A second Stipulation was prepared and submitted to the [c]ourt which purported to establish a child support obligation from [Jami] to [David].

    17. At the time the second Stipulation was prepared, unbeknownst [to the] [c]ourt there was a contemporaneous agreement between the parties [that] again waived any support obligation from [Jami] to [David].

    18. Neither Stipulation disclosed to the [c]ourt the underlying financial circumstances of the parties, nor did it alert the [c]ourt to the fact that there may have been a gross inequity in the division of property between the parties.

    19. There is no evidence upon which a[c]ourt can conclude that [Jami] was informed of her rights or of the size and value of the marital estate prior to the preparation of the Divorce Stipulation.

    20. [Judge Kern] executed the Divorce Decree ignorant of the fact that the parties had entered into a secret agreement drafted by counsel for [David] to bar the collection of any support by [David] from [Jami].

    21. The secret agreement purports to do precisely what [Judge Kern] had specifically refused to approve, and the execution of the Decree was predicated upon the express representation, through the Stipulation, that a meaningful support obligation was established.

    22. The "secret" or undisclosed agreement entered into between the parties was contrary to [Judge Kern's] previous direction to counsel after review of the first [S]tipulation.

    23. That [Judge Kern] would not have executed the Decree of Divorce, based upon the second [S]tipulation presented to it, had it been specifically advised by counsel and had it known that in fact the contemporaneous agreement waiving child support had been made.

    24. The waivers of support and alimony appear to the [c]ourt to be intended to preclude any property division in funds or ranch property of the parties' sizeable interest in the family ranching operation.

    25. The purported transfer from [David] to his father, during these divorce proceedings, of his interest in the family ranch operation was not an arms length transaction when considered in light of the income tax records and other limited financial information made available to the [c]ourt.

    26. That when [Jami] subsequently moved for custody of the children in 2002, [David] "reneged" upon the secret agreement and attempted to obtain several years of past due child support.

    27. That the review of the issues of support and visitation[,] which gave rise to these proceedings[,] led to the [c]ourt's discovery of the fraud perpetrated upon it in the course of the initial proceedings, granting the Divorce Decree.

Delaney's findings that Judge Kern would not have entered the decree had she known of the private contractual agreement, "it does not appear that there is any dispute that this decree was obtained by a fraud upon the court." *Id.*, 2004 SD 116 at ¶ 17, 688 N.W.2d at 435. The Court noted that SDCL 15–6–60(b) does not set any rigid time limit on a court to set aside a judgment for fraud upon the court.

> This type of fraud is different than that associated with fraud upon the parties. 'Fraud upon the court' should, we believe, embrace only that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication ... In addition, it has been said that '[i]n order to set aside a judgment or order because of fraud upon the court under Rule 60(b), ... it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision.' Courts have found fraud upon the court only where there has been the most egregious conduct involving a corruption of the judicial process itself. Examples are bribery of judges, employment of counsel to 'influence' the court, bribery of the jury, and the involvement of an attorney (an officer of the court) in the perpetration of fraud.

*Id.*, 2004 SD 116 at ¶ 19, 688 N.W.2d at 435 (quoting *Gifford v. Bowling*, 86 S.D. 615, 625, 200 N.W.2d 379, 384 (1972)).

[¶ 19.] In *Reaser v. Reaser* we examined Ortner's conduct in light of Judge Delaney's findings:

> Here, under Judge Delaney's findings, the actions of these parties and the attorney are egregious conduct involving corruption of the judicial process itself.

Considering those findings, this fraudulent conduct may have violated a criminal statute, and it certainly violated the Rules of Professional Conduct for attorneys.

\* \* \*

Moreover, under the trial court's findings, Ortner's preparation of, and participation in, the concealment of the private agreement violated the Rules of Professional Conduct. "Because the courts of this state must rely upon the assistance of attorneys to ascertain the truth of matters before them, attorneys must be fair and forthright with the courts." *Matter of Discipline of Mines*, 523 N.W.2d 424, 426 (S.D.1994) (citing *Matter of Discipline of Schmidt*, 491 N.W.2d 754, 755 (S.D.1992)). Moreover, "the requirement of candor towards the tribunal goes beyond simply telling a portion of the truth. It requires every attorney to be fully honest and forthright." *In re Discipline of Wilka*, 2001 SD 148, ¶ 15, 638 N.W.2d 245, 249. It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. *Mines*, 523 N.W.2d at 426.

Ortner's conduct appears to violate that duty of candor toward the court. Rule 3.3 of the Rules of Professional Conduct provides in relevant part that:

(a) A lawyer shall not knowingly:

> ...

> (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall timely take reasonable remedial measures, including, if necessary, disclosure to the tribunal....

(d) In an ex parte proceeding, except grand juries and applications for

search warrants, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

Here, the trial court's findings indicate that both Ortner and the parties were dishonest in their representations and disclosures to the original divorce court. Their participation in, preparation of, and failure to disclose the "private agreement" allowed them to circumvent the original trial court's express direction. It was egregious conduct that corrupted the judicial process through the involvement of an officer of the court. This type of fraud upon the court is not subject to the Rule 60(b) one year time limitation. Consequently, Judge Delaney was authorized, upon his own motion, to vacate the relevant portions of the decree despite the fact that it had been in effect for over four years.

*Id.*, 2004 SD 116 at ¶ 19–23, 688 N.W.2d at 435–436.

[¶ 20.] This Court's opinion in *Reaser v. Reaser* was handed down on October 13, 2004. Six days later, on October 19, 2004, Ortner wrote to Judge Kern:

Dear Judge Kern:

As hollow as it may seem at this late date, I cannot adequately express how deeply I apologize to you for the way I mishandled the Reaser divorce five and one-half years ago.

My heart and emotions totally got in the way of my brain and legal training. I had been going to brandings with David Reaser and his father for nearly twenty years at that time, and David was so adamant about not accepting any child support from his wife that I went ahead and prepared the private agreement for them to sign. I had no intent to defraud the Court or violate any laws. While

trying to help a client I have totally jeopardized twenty-six years of law practice and nearly forty years of public service and service to the public.

You had always treated me with total honesty and fairness and that is what makes me so sick and ashamed about the way I handled this matter.

When this came to light in April 2003, I did an affidavit admitting to everything that had occurred. Since that date I have not had a decent night of sleep.

In twenty-six years there has been one private reprimand from the Disciplinary Board and two investigations in criminal cases which were found to be frivolous and were sealed.

What I did in this case clearly violated the Rules of Professional Responsibility, and I am ready to accept whatever action is recommended by the Disciplinary Board.

Respectfully submitted,

/s/

MICHAEL P. ORTNER

LAWYER

[¶ 21.] The Disciplinary Board generated a complaint against Ortner based upon his conduct in *Reaser v. Reaser*. In its Notice of Hearing the Disciplinary Board informed Ortner that:

The allegations indicate possible violations of the Rules of Professional Conduct, including but not limited to:

Rule 1.7 concerning conflicts of interest;

Rule 3.3 concerning candor;

Rule 8.4(a), (c) and (d) concerning misconduct and violation of SDCL 16–16–18, SDCL 16–18–13, and SDCL 16–18–19.

[¶ 22.] Ortner's hearing before the Disciplinary Board took one hour on January 7, 2004. Ortner was the sole witness. Ex-

hibits introduced at the hearing included Ortner's April 21, 2003 Affidavit Regarding Motion to Deny Claim for Arrears, Ortner's letter of apology to Judge Kern, a letter of support from Southern Hills Bar Association members, a letter of support from Judge A.P. Fuller, and a letter of support from Judge Kern dated January 4, 2005.[2]

[¶ 23.] On February 15, 2005 the Disciplinary Board entered its findings of fact, conclusions of law, recommendations, and formal accusation. The Board found, in part,

23. Ortner's conduct toward Judge Kern was not based on an intent to defraud the trial court, nor did he intend to violate any laws. His failure to recognize the potential relevance to Judge Kern of the parties' private agreement and to heed his corresponding duty to disclose the agreement to Judge Kern was an isolated and extreme aberration from his normal course of conduct, and is not likely to ever be repeated.

24. As a result of the publication of *Reaser v. Reaser*, Ortner already has experienced considerable public humiliation and notoriety, as well as personal grief and anguish.

[¶ 24.] The Board concluded:

25. While Ortner violated Rules 3.3 and 8.4 of the Rules of Professional Conduct, no public interest or professional purpose would be served

**2.** Dear Chairman Turbak and Members of the Board:

I have been asked by Gene Lebrun to write a letter of recommendation to the Board on behalf of Michael Ortner. Obviously this places me in an unusual situation as I was the judge Mr. Ortner deceived by his conduct in the *Reasor [sic] v. Reasor [sic]* divorce proceeding. I certainly do not condone Mr. Ortner's conduct and believe that the Supreme Court, in its decision, sent a strong message to Mr. Ortner and a powerful reminder to the Bar regarding its obligation of candor to the Court.

After much consideration, I have decided to write this letter on Mr. Ortner's behalf because I believe from my observations of his practice, that this incident was an aberration rather than the standard operating procedure for Mr. Ortner. As you may know, the Seventh Circuit Judicial Court rotates coverage of the Hot Springs docket on a yearly basis. I covered this docket in 1999 and during that year had numerous contacts with Mr. Ortner as court convened in Hot Springs between two and four times each month. He appeared before me dozens of times and on all occasions, was well prepared, courteous and professional. He is a compassionate person and seems to be a gentle soul. He has a good reputation in the community and I never had cause to question his honesty.

Unfortunately, not all attorneys enjoy this level of trust with the judges before whom they practice. There are lawyers who are not explicitly trusted by the bench as a consequence of their practice habits. Their pleadings, arguments and authorities are closely scrutinized for accuracy. Mr. Ortner was not that kind of an attorney. He had never misrepresented any fact or issue to me in any proceeding. I find his conduct in the Reasor [sic] case surprising and out of character.

Mr. Ortner sent me an apology letter after the Supreme Court issued its opinion. Certainly one could perceive this as self-serving in light of the inevitability of these proceedings. It is my belief, however, that his remorse is very deep and sincere and that he is devastated by his conduct and its consequences.

Few lawyers who deceive a court are caught so completely in their lie or reprimanded so publicly. You are charged with the difficult responsibility of determining the sanctions which should now be imposed. It is my view that this is an isolated act of dishonesty and that he will not repeat this mistake.

Sincerely,

/s/

Janine M. Kern
Circuit Court Judge

by suspending Ortner's privilege to practice law.

[¶ 25.] The Board recommended, in part:

1. Michael Ortner be censured for his violation of the Rules of Professional Conduct.

## STANDARD OF REVIEW

[¶ 26.] This Court gives careful, due consideration to the Disciplinary Board's findings of fact because it had the advantage of encountering the witness first hand.[3] *In re Arendt*, 2004 SD 83, 684 N.W.2d 79. We do not defer to a recommended sanction. *In re Discipline of Laprath*, 2003 SD 114, 670 N.W.2d 41. "The final determination for the appropriate discipline of a member of the State Bar rests firmly with the wisdom of this Court." *Matter of Discipline of Wehde*, 517 N.W.2d 132, 133 (S.D.1994).

## LEGAL ANALYSIS

[¶ 27.] Article V, Section 12 of the South Dakota Constitution places an affirmative duty on this Court to "govern terms of courts, admissions to the bar and discipline of members of the bar." We defined our constitutional regulatory relationship with the bar in Supreme Court Rule 78–1, Rule II(a) which is codified at SDCL 16–19–31:

The license to practice law in this state is a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the court. It is the duty of every recipient of that privilege to conduct himself [and herself] at all times, both professionally and personally, in conformity with the standards imposed upon members of the bar as conditions for the privilege to practice law.

The purpose of the disciplinary process is to protect the public from fraudulent, unethical or incompetent practices by attorneys. *Matter of Discipline of Kallenberger*, 493 N.W.2d 709 (S.D.1992). It is also intended to deter like conduct by other attorneys. *In re Discipline of Eicher*, 2003 SD 40, 661 N.W.2d 354. The disciplinary process is not conducted to punish the lawyer. *Petition of Pier*, 1997 SD 23, 561 N.W.2d 297.

The preservation of trust in the legal professional is essential. *Pier*, 1997 SD 23 at ¶ 8, 561 N.W.2d at 299. Lawyers in the practice of law have a formidable responsibility to protect their clients' "property, their freedom, and at times their very lives." *Matter of Chamley*, 349 N.W.2d 56, 58 (S.D.1984). "Only by providing high quality lawyering can the integrity of the legal profession remain inveterate and the confidence of the public and the Bar remain strong." *Wehde*, 517 N.W.2d at 133.

*In re Discipline of Mattson*, 2002 SD 112, ¶ 40, 651 N.W.2d 278, 286.

[¶ 28.] An attorney possesses and exercises "substantial power and authority." *Discipline of Laprath*, 2003 SD 114 at ¶ 42, 670 N.W.2d at 55. "A certificate of admission to the bar is a pilot's license which authorizes its possessor to assume

---

3. While the Disciplinary Board had before it the documents Ortner drafted and our analysis in *Reaser v. Reaser*, the only witness to testify at the hearing in this case was Ortner. The Board, in effect, heard only the defense case and did not have the opportunity to hear from the Reasers, Judge Delaney or Judge Kern. We have had the opportunity to consider the same evidence, and in addition, Ortner's concession at oral argument that he was aware of the significance Judge Kern placed on having child support provisions in divorce cases.

full control of important affairs of others and to guide and safeguard them when, without such assistance, they would be helpless." *In re Egan*, 52 S.D. 394, 402, 218 N.W. 1, 4 (1928)(quoting *In re Kerl*, 32 Idaho 737, 188 P. 40 (1920)).

[¶ 29.] This Court's decisions have made it clear that parents in South Dakota, as a matter of public policy and statutory duty, have an obligation to provide support for their children. *Thomas v. Hague*, 2002 SD 12, 639 N.W.2d 520. Ortner, in the course of his twenty-five plus years of practice, "represented numerous clients in divorce and family law matters" and was charged with this knowledge of black letter law.

[¶ 30.] Rather than advising David concerning child support obligations, Ortner followed his client's directive and drafted the original stipulation and divorce decree which omitted the payment of on-going child support. When Ortner submitted the documents to Judge Kern, she refused to enter a decree that provided no support.

[¶ 31.] Ortner advised David of Judge Kern's position and suggested that the stipulation and decree provide for support. He then advised David that he could tear up the support checks, thereby thwarting the intention of the child support obligation. When David advised Ortner that Jami insisted on a written agreement waiving child support Ortner did not advise him that parties cannot make a valid irrevocable contract relieving them of the duty to support their minor children. *Thomas*, 2002 SD 12 at ¶ 8, 639 N.W.2d at 521. Rather, he prepared a revised stipulation providing for child support and a private contractual agreement where each party agreed to "not seek to collect child support" from the other. Ortner advised Jami, who was unrepresented, that the private contractual agreement bound the parties.

[¶ 32.] When Ortner presented the revised stipulation providing for child support and the decree incorporating its terms to Judge Kern she signed the decree. As the Disciplinary Board found, "Ortner did not advise Judge Kern of the parties' intent to not actually collect child support from each other, nor did he inform her of the existence of their written agreement to that effect." Moreover, Ortner admitted at the Disciplinary Board hearing that in one other case he had prepared a similar type of secret agreement in an attempt to avoid paying child support. In *Eicher*, 2003 SD 40 at ¶ 29, 661 N.W.2d at 364, and previous cases we examined, the attorney's motive behind his misconduct:

As we said in *Dorothy*, 2000 SD 23 at ¶ 47, 605 N.W.2d at 507:

> This clearly was not an isolated incident where emotions of the moment in the heat of litigation overcame better judgment. *In re Snyder*, 472 U.S. 634, 647, 105 S.Ct. 2874, 2882, 86 L.Ed.2d 504, 514 (1985). The worst of it was prepared or written out in advance with sufficient time to reflect on the inflammatory contents of the statements before they were delivered.

"Moreover, these acts were not an isolated 'foolish and negligent' incident, *id.* They were intentional ..." *Mattson*, 2002 SD 112 at ¶ 55, 651 N.W.2d at 289.

[¶ 33.] The Disciplinary Board also found, however, that "Ortner's conduct toward Judge Kern was not based on an intent to defraud the trial court, nor did he intend to violate any laws." This language basically adopts language in Ortner's letter of apology to Judge Kern. It is not consistent with Ortner's admission that when he initially sought approval of the decree without child support, he specifically called that matter to Judge Kern's at-

tention as he knew it was her policy to require child support. The Board's finding also fails to appropriately consider the fact that Judge Delaney found that the "secret agreement purports to do precisely what the court had specifically refused to approve" and was "contrary to the court's previous direction to counsel." It is not consistent with Judge Delaney's conclusion that the divorce was obtained by fraud upon the court. It is also at odds with this Court's conclusion in *Reaser v. Reaser* that Ortner was dishonest in his representation and disclosures to Judge Kern, circumvented Judge Kern's express direction and engaged in "egregious conduct that corrupted the judicial process through the involvement of an officer of the court." *Reaser*, 2004 SD 116 at ¶ 23, 688 N.W.2d at 436.

[¶ 34.] The egregious conduct of committing fraud upon the court also violates SDCL 16-16-18 (Oath of Attorney which provides, in part, "I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice

or false statement of fact or law[.]"), SDCL 16-18-13 (Attorney's duty to respect courts), SDCL 16-18-19 (Attorney's duty to use truthful means), and SDCL 16-18-26(1) (Misdemeanor to practice deceit or collusion with intent to deceive the court). As such, the Board's finding is clearly erroneous.

■■■■ [¶ 35.] We agree with the Disciplinary Board's finding that Ortner violated Rules 3.3 (Candor Toward the Tribunal) [4] and 8.4 (Misconduct) [5] of the Rules of Professional Conduct.

We cannot overemphasize the importance of attorneys in this state being absolutely fair with the court. Every court ... has the right to rely upon an attorney to assist it in ascertaining the truth of the case before it. Therefore, candor and fairness should characterize the conduct of an attorney at the beginning, during, and at the close of the litigation.

*Matter of Bihlmeyer*, 515 N.W.2d 236, 239 (S.D.1994). "Attorneys have the responsibility to present the record with accuracy

---

4. Rule 3.3 provides, in part:
   (a) A lawyer shall not knowingly:
   * * *
   (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall timely take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false. However, in a criminal matter, the lawyer shall not participate with the client in the presentation of the client's testimony which the lawyer knows to be false.
   * * *
   (d) In an ex parte proceeding, except grand juries and applications for search war-

rants, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

5. Rule 8.4 provides, in part:
   It is professional misconduct for a lawyer to:
   (a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;
   (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
   (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
   (d) engage in conduct that is prejudicial to the administration of justice[.]

and candor." *In re Discipline of Dorothy*, 2000 SD 23, ¶ 51, 605 N.W.2d 493, 509.

## APPROPRIATE DISCIPLINE

■ [¶ 36.] The disciplinary options at this Court's disposal are private reprimand, public censure, placement on probationary status, suspension for up to three years and disbarment. *Mattson*, 2002 SD 112 at ¶ 51, 651 N.W.2d at 288; SDCL 16–19–35. The appropriate discipline in a particular case is determined by considering the seriousness of the misconduct, the likelihood that it or similar misconduct will be repeated, and the attorney's prior record. *Discipline of Eicher*, 2003 SD 40 at ¶ 47, 661 NW2d at 369.

[¶ 37.] Without question Ortner has led a life of public service. His disciplinary history is minimal. Custer and Fall River County attorneys have found him honest and ethical in legal matters. The judge he deceived views his deception as an isolated act that will not be repeated. Weighing against this, however, is that Ortner's conduct in this matter was a direct fraud on the court which corrupted the delicate balance of judicial fact finding, went to the heart of legal decision making and constituted egregious conduct by an officer of the court that corrupted the judicial process

[¶ 38.] The Board found that Ortner was sincerely sorry for his misconduct. However that must be significantly tempered by the fact he did not self-report and only apologized after the acts were discovered by Judge Trimble and Judge Delaney and were examined and published in *Reaser v. Reaser*. Ortner allowed them to remain a significant fraud on the court until that discovery. Ortner only admitted his misconduct after publication of *Reaser* even though his letter to Judge Kern indicated that when "this came to light in April of 2003, I did an affidavit admitting to everything that had occurred. Since that date I have not had a decent night of sleep." Thus, Ortner admitted he was clearly aware of his ethical violations no later than April 2003 to the point where he could not sleep because of its seriousness. Nevertheless he waited an additional sixteen months to apologize and never did self report to the Disciplinary Board.

■ [¶ 39.] In its finding the Disciplinary Board found that as a result of the publication of *Reaser v. Reaser*, Ortner has "already experienced considerable public humiliation and notoriety, as well as personal grief and anguish." The Board's rationale is inconsistent with our holding since statehood that the purpose of an attorney disciplinary proceeding is for the protection of the public and not to punish the offending attorney. Publicity and personal grief are not factors in deciding appropriate discipline. "Under art V, § 12 of our Constitution, this Court, and not the media nor any third party, is solely charged with the responsibility for determining what is appropriate discipline in an attorney misconduct case." *Discipline of Mattson*, 2002 SD 112 at ¶ 51, 651 N.W.2d at 288; *Discipline of Wilka*, 2001 SD 148, ¶ 17, 638 N.W.2d 245, 250; *Discipline of Dorothy*, 2000 SD 23 at ¶ 40, 605 N.W.2d at 505; *Matter of Discipline of Hopewell*, 507 N.W.2d 911, 917 (1993).

[¶ 40.] The citizens of this state and those non-residents who seek relief in our Courts have a right to expect that as far as humanly possible, the fact finders, be they a jury or a judge will attempt to find the true facts and correctly apply the law. Witnesses take oaths to tell the truth. Jurors take oaths to do their duty. Judges take an oath consistent with their calling. All of this crumbles should an attorney violate his oath and perpetrate a fraud upon the court.

[¶ 41.] Circuit judges routinely are called upon to decide important cases. "The power which the people of this state have entrusted to a circuit court judge affects the people's lives, welfare and property to no small extent." *Matter of Discipline of Hopewell,* 507 N.W.2d at 917 (quoting *Cummings v. Mickelson,* 495 N.W.2d 493, 496 (S.D.1993)). This was an issue involving child support. While Jami and David protected their respective interests, the trial court which properly protected the best interests of the children by refusing to waive child support at the outset, was ultimately duped by Ortner's actions. This made the trial court's already difficult duty to provide for the interests of the children, now impossible:

> "This state has an interest in protecting the welfare of its children which includes their standard of living." *Feltman v. Feltman,* 434 N.W.2d 590, 592 (S.D. 1989). All too often in setting child support, "[t]here are simply too few dollars to meet even the most modest standard of living ... [and judges] are called upon to apportion poverty and its accompanying misery." *State ex rel V.K.H. v. S.W.,* 442 N.W.2d 920, 925 (S.D.1989) (Gilbertson, Circuit Judge, concurring).

*Ochs v. Nelson,* 538 N.W.2d 527, 531 (S.D. 1995).

[¶ 42.] Unfortunately when we examine the issue of an attorney intentionally misleading a court or other similar acts, we do not find a case of first impression. Clearly it has been an on-going issue which has faced this Court with disappointing regularity. *In re Arendt,* 2004 SD 83, 684 N.W.2d 79; *In re Discipline of Laprath,* 2003 SD 114, 670 N.W.2d 41; *In re Discipline of Eicher,* 2003 SD 40, 661 N.W.2d 354; *In re Discipline of Wilka,* 2001 SD 148, 638 N.W.2d 245; *In re Discipline of Dorothy,* 2000 SD 23, 605 N.W.2d 493; *Matter of Bihlmeyer,* 515 N.W.2d 236; *Matter of Discipline of Hopewell,* 507 N.W.2d 911; *Matter of Discipline of Schmidt,* 491 N.W.2d 754.

[¶ 43.] In some cases we have examined an attorney's misrepresentation and have determined that public censure was the appropriate discipline:

> "This Court has previously imposed public censure for misrepresentations to the court." *Bihlmeyer,* 515 N.W.2d 236 at 238 (holding public censure appropriate for attorney who misrepresented a fee agreement to a workers' compensation tribunal) (citations omitted). *See also Matter of Discipline of Mines,* 523 N.W.2d 424 (S.D.1994)(holding public censure appropriate for attorney who failed to remedy inadvertent misrepresentations relied upon by the court in resolving proceeding against attorney); *Matter of Discipline of Schmidt,* 491 N.W.2d 754 (S.D.1992)(holding public censure appropriate for attorney who intentionally omitted required affidavit that nonresident attorney participating in trial had not been subject to disciplinary action); *Matter of Discipline of Rensch,* 333 N.W.2d 713 (S.D.1983)(holding public censure appropriate for attorney who misrepresented to judge status of fee arrangement with purportedly indigent defendant in criminal prosecution). While Wilka may not have directly lied to the court, he intentionally evaded the plain and understandable questions of Judge Severson. In doing so, he misled the court and misrepresented the evidence as being more than it was.

*Discipline of Wilka,* 2001 SD 148 at ¶ 14, 638 N.W.2d 245 at 249. We warned, however, "[p]ublic censure in this type of case has been the penalty of the past, but whether it will be in the future is debata-

ble and the whole Bar should take note of this." *Mines,* 523 N.W.2d at 427.

[¶ 44.] This Court suspended Eicher, in part, for failure to let the court know he was in possession of a video tape which he claimed to be missing and essential to the defense of his client. In *Matter of Voorhees,* 294 N.W.2d 646 (S.D.1980) we disbarred an attorney who forged a document to obtain a greater federal payment for a business enterprise.

[¶ 45.] Most recently, the Board recommended the 120 day suspension of an attorney who violated Rules 3.3 and 8.4, SDCL 16–18–26(1) and SDCL 16–18–19. *In re Arendt,* 2004 SD 83 at ¶ 14, 684 N.W.2d at 79. In 1995 Arendt entered a business transaction with a client but failed to advise the client of the requirements of Rule 1.8. In response to the Board's inquiry, Arendt submitted a document purported to be a copy of a 1995 letter to the client advising him of the requirements of Rule 1.8. The letter was a fabrication. When the Disciplinary Board informed Arendt's counsel of its concerns about the letter's accuracy, Arendt admitted that he had created the letter to mislead the Board and promptly advised the Board that the document was false. In testimony before the Board Arendt admitted the letter was false and was remorseful.

[¶ 46.] The Disciplinary Board concluded that "no public interest or professional purpose would be served by suspending Ortner's privilege to practice law." Its recommendation of a public censure cannot be accepted by this Court in light of the conduct in *Voorhees; Eicher* and most recently *Arendt* where the Board recommended suspension only months before this case.

[¶ 47.] It is difficult to conceive of a more blatant act of fraud than that committed in Ortner's drafting of the private contractual agreement and his participation in its execution which were directly contrary to the trial court's express direction after reviewing the first stipulation. This cannot be viewed as accidental or an honest mistake as Ortner has conceded that he knew prior to this case that it was Judge Kern's policy to require child support in divorce cases involving minor children. This private agreement did exactly what the trial court refused to approve after Ortner previously called the proposed no-support provision to the court's attention. The subsequent execution of the decree of dissolution was predicated on the revised stipulation's provision providing for meaningful child support. Ortner failed to self report for approximately six years. It was only after Judges Trimble and Delaney discovered the private contractual agreement that Ortner admitted his conduct. His apology to Judge Kern came only after the release of our decision in *Reaser v. Reaser* where his conduct became public. Moreover, he admitted he prepared a similar "secret agreement" on another occasion.

[¶ 48.] Lawyers must guard against conduct that diminishes public confidence in the legal system. *See Matter of Estate of Schuldt,* 428 N.W.2d 251 (S.D. 1988). While the legal profession is largely self-governing, the ultimate authority over the profession is vested with this Court, Art V, § 12 of the South Dakota Constitution. The preamble to the South Dakota Rules of Professional Conduct provides, in part:

> The legal profession's relative autonomy carries with it special responsibilities of self-government. The profession has a responsibility to assure that its regulations are conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar. Ev-

ery lawyer is responsible for observance of the Rules of Professional Conduct. A lawyer should also aid in securing their observance by other lawyers. Neglect of these responsibilities compromises the independence of the profession and the public interest which it serves.

It is clear from the frequency of this type of misconduct that public censure is not providing sufficient deterrence to adequately protect the public in the future.

[¶ 49.] Had there been a history of violations by Ortner or if we suspected he was likely to repeat such acts in the future, for the protection of the public our only appropriate course of action would be to enter an order of disbarment.[6] Our review of the record indicates that such does not appear to be the case.

[¶ 50.] Nevertheless, we once again stress the duty SDCL 16–19–31 places upon this Court:

> [T]he license to practice law in this state is a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters and to aid in the administration of justice as an attorney and as an officer of the court. It is the duty of every recipient of that privilege to conduct himself [and herself] at all times, both professionally and personally, in conformity with the standards imposed upon members of the bar as conditions for the privilege to practice law.

See also Laprath, 2003 SD 114 at ¶ 43, 670 N.W.2d at 55–56. Moreover:

> By admitting an attorney to its bar, the court presents him to the public as wor-thy of its confidence in all of his professional duties and relations. If afterwards it come [sic] to the knowledge of the court that he has become unworthy, it is its duty to withdraw that indorsement [sic], and thereby cease to hold him out to the public as worthy of professional employment.

In re Ramsey, 24 S.D. 266, 274, 123 N.W. 726, 729 (1909) (quoting Serfass' Case, 116 Pa. 455, 9 A. 674; In re Elliott, 18 S.D. 264, 100 N.W. 431 (1904)).

[¶ 51.] After reviewing this record we conclude that Ortner's conduct was of such egregious professional nature that it is in the best interests of the public and the legal profession to suspend him from the practice of law for a period of nine months.

[¶ 52.] Pursuant to SDCL 16–19–35(2) a judgment of suspension will be entered for a period of nine months effective July 29, 2005. Within ten days after the effective date of the suspension order, Ortner shall file with the Supreme Court an affidavit showing:

1) That he has fully complied with the provisions of the order and with this chapter; and

2) All other state, federal, and administrative jurisdictions to which he is admitted to practice. Such affidavit shall also set forth the residence or other address of the disbarred or suspended attorney where communications may thereafter be directed to him.

SDCL 16–19–80.

[¶ 53.] Prior to any application for reinstatement Ortner must take and pass the

---

**6.** We note that under the ABA Standards for Imposing Lawyer Discipline, which we have not adopted, disbarment would be the appropriate discipline. Rule 6.11.

The same rationale has been in effect in this jurisdiction since the adoption of our first Territorial Code in 1877. Under SDCL 16–19–34, "An attorney and counselor who is guilty of deceit or collusion, or consents thereto, with intent to deceive a court or judge, or party to an action or proceeding, is liable to be disbarred, and shall forfeit to the injured party treble damages to be recovered in a civil action."

Multistate Professional Responsibility Examination. He must also reimburse the State Bar of South Dakota and the Unified Judicial System for expenses allowed under SDCL 16–19–70.2.

[¶ 54.] Upon expiration of his suspension Ortner may file a petition for reinstatement pursuant to SDCL 16–19–87. He must also submit an affidavit to this Court stating:

1. He has reviewed the Rules of Professional Conduct;

2. He pledges he will devote every effort in his future practice to fully abide by the South Dakota Rules of Professional Conduct;

3. He recognizes fully that his conduct violated the Rules of Professional Conduct by which he is bound;

4. He has taken and passed the Multistate Professional Responsibility Examination;

5. He has reimbursed the State Bar of South Dakota and the Unified Judicial System; and

6. Upon reinstatement, he will maintain professional malpractice insurance along with proof thereof.

[¶ 55.] ZINTER and MEIERHENRY, Justices, and WILBUR, Circuit Judge and MILLER, Retired Justice, concur.

[¶ 56.] WILBUR, Circuit Judge, for SABERS, Justice, disqualified.

[¶ 57.] MILLER, Retired Justice, for KONENKAMP, Justice, disqualified.